1          UNITED STATES DISTRICT COURT
             DISTRICT OF MINNESOTA
2
   ------------------------------------------------------------
3                                    )
   United States of America,         )   File No. 16-CR-344
4                                    )            (MJD)
           Plaintiff,                )
5                                    )
   vs.                               )   Minneapolis, Minnesota
6                                    )   May 15, 2018
   Marlyn Charles Comes,             )   10:43 a.m.
7                                    )
           Defendant.                )
8                                    )
   ------------------------------------------------------------
9
             BEFORE THE HONORABLE
10              MICHAEL J. DAVIS
        UNITED STATES DISTRICT COURT JUDGE
11              **(SENTENCING HEARING)**

12 <u>APPEARANCES</u>
     For the Plaintiff:        UNITED STATES ATTORNEY'S OFFICE
13                             John E. Kokkinen, AUSA
                               600 U.S. Courthouse
14                             300 South Fourth Street
                               Minneapolis, MN 55415
15
     For the Defendant:        CAPLAN & TAMBURINO LAW FIRM, PA
16                             Joseph P. Tamburino, ESQ.
                               525 Lumber Exchange Building
17                             10 South Fifth Street
                               Minneapolis, MN 55402
18
     Court Reporter:           STACI A. HEICHERT,
19                             RDR, CRR, CRC
                               1005 U.S. Courthouse
20                             300 South Fourth Street
                               Minneapolis, Minnesota 55415
21

22

23     Proceedings recorded by mechanical stenography;
   transcript produced by computer.
24

25

1           **P R O C E E D I N G S**

2             **IN OPEN COURT**

3           THE COURTROOM DEPUTY:  The United States of

4   America versus Marlyn Charles Comes; Criminal Case No.

5   16-CR-344.  Counsel, please state your appearances for the

6   record.

7           MR. KOKKINEN:  Good morning, Your Honor.  John

8   Kokkinen on behalf of the United States.

9           THE COURT:  Good morning.

10          MR. TAMBURINO:  Good morning, Your Honor.  Joe

11  Tamburino representing Mr. Comes who is present.

12          THE COURT:  Good morning.  Please step forward.

13  Counsel, have you had an opportunity to read the presentence

14  investigation report in this matter?

15          MR. KOKKINEN:  Yes, Your Honor.

16          MR. TAMBURINO:  Yes, Your Honor.

17          THE COURT:  Any objections to the factual

18  statements contained in the presentence investigation

19  report?

20          MR. KOKKINEN:  No, Your Honor.

21          MR. TAMBURINO:  No.

22          THE COURT:  The Court will adopt the factual

23  statements contained in the presentence investigation report

24  as its own.

25          Counsel, have you had an opportunity to review the

1    advisory guideline calculations that have been prepared for

2    the Court?

3              MR. KOKKINEN:  Yes.

4              MR. TAMBURINO:  We have, Your Honor.

5              THE COURT:  Any objections to those guideline

6    calculations?

7              MR. KOKKINEN:  None from the government.

8              MR. TAMBURINO:  No, Your Honor.

9              THE COURT:  All right.  The Court will adopt those

10   guidelines as its own.  Total offense level of 19; criminal

11   history category of 1; guideline range of custody status of

12   30 to 37 months in prison; supervised release, one year to

13   three years; fine range of $6,000 -- $6,000 to $60,000;

14   restitution is mandatory; and a special assessment of $100.

15   Mr. Tamburino, do you wish to be heard on sentencing?

16             MR. TAMBURINO:  Thank you, Your Honor.  Yes.  Your

17   Honor, Mr. Comes, Dr. Comes, comes to you in a situation

18   that he never thought he would have been in.  And he is not

19   making any excuses for his conduct, but he would like to

20   explain.  He has a brief statement, but he wanted me to

21   express certain things, as well as I would like to talk on

22   his behalf.

23             As you know from the pre-sentence report,

24   Dr. Comes has had, other than this offense, an excellent

25   history.  He's been married for 22 years to Pamela, who is

1    here.  They have three children.  He has been an upstanding

2    citizen in society.  And what happened was, Your Honor, is

3    that approximately ten years ago when he went into the

4    practice that he wound up taking over, the practice had a

5    number of clientele that were just coming to him through

6    what eventually we would know as runners.  And specifically,

7    when he took over the practice in about 2010 or '11, he

8    wound up seeing some people come in through this person that

9    we now know as Mr. Warsame, Sahal Warsame.  And Mr. Comes

10   was under the mistaken impression that as long as he

11   provided services, as long as he did not try to doctor up

12   any type of accidents, as long as he did not have fictitious

13   or ghost clients, that he should be within the law.

14        He did see over the years other practitioners

15   become involved in legal troubles, never federal.  He saw

16   that there were some state issues, state prosecutions, but

17   nothing to this level.  And what occurred is this practice

18   of the runners bringing clients, patients, in started

19   snowballing, and it was very little at first, but then,

20   basically, come 2012, '13, it became a lot.

21        And what Mr. Comes wishes to express is that he

22   understands that by calling them something that they

23   weren't, such as interpreters or getting interpreted

24   services, does not excuse his conduct in any way, shape, or

25   form.  But what happened was that as he became more

 1    involved, the people who were bringing him, the clients,

 2    basically told him that if he did not accept them, they

 3    would go elsewhere.  And as this Court knows from having all

 4    of the cases and the investigation, this was fairly

 5    widespread.  There were a number of professional clinics who

 6    would accept such clients under such conditions with the

 7    runner system and obviously to different degrees.

 8          And as Mr. Comes basically saw what was happening,

 9    he couldn't or would not stop the train, and it was

10    difficult for him.  Obviously based on human nature,

11    sometimes we make or continue to make a bad choice because

12    we become so involved and we become almost used to the

13    situation.  It's just like as we all know the jury

14    instruction on turning a blind eye, well, that doesn't

15    excuse your conduct.  In this case, there was a turning of a

16    blind eye, Your Honor, and it was basically because he

17    became involved and it was hard for him to stop.

18          He also thought that even if something were to

19    have happened legally, whether it would be a state

20    investigation or investigation by law enforcement, he never

21    thought that in any way, shape, or form he would be here

22    today.

23          Mr. Comes acknowledged his actions immediately.

24    As the Court knows, the search warrants went out I believe

25    on December 11th, 2015, and Mr. Comes came to see me the

1    next day, and within weeks we were in communication with

2    Mr. Kokkinen.  And he wound up cooperating.  The first

3    proffer was within six or eight weeks.  The second proffer

4    was within weeks after that.  He gave any and all

5    information that he had.  He closed his practice.  He

6    stopped receiving any type of income that was based on this.

7    He had to change basically his whole family.  He took other

8    types of odd jobs, winding up in construction.  What he did

9    was that as soon as these search warrants came out and his

10   office was searched, he realized that he must divulge what

11   happened.  He told me about it and then immediately, within

12   weeks, we started to cooperate.  He truly was the first

13   person cooperating in this case.

14          His cooperation, Your Honor, also, as the

15   submission of the 5K shows, even though he never had the

16   opportunity of testifying in any matter, it was pretty

17   well-known that Mr. Comes was cooperating.  Though none of

18   us had divulged it, it is a small community and you can hear

19   or find out information that it got out that Mr. Comes was

20   cooperating.  And knowing that he was doing that from the

21   beginning, that he had proffered a couple of times, that he

22   was willing to give more information and testify I believe

23   did effect others from trying to -- to try to resolve their

24   cases.  Obviously this sentencing was continued again

25   because Mr. Comes was willing to testify against

1    Mr. Warsame, and he would have done so, there is absolutely

2    no doubt about that.

3            Under the 3553 factors, Your Honor, obviously one

4    of the most important factors not only to punish but is to

5    deter criminality.  Mr. Comes, Your Honor, is in a position

6    where he would not re-offend again.  There is no longer a

7    license to practice.  He closed his business as quickly as

8    he could.  He did not accept any other type of payments

9    related to this case.  He took other jobs, working in

10   grocery stores, now in construction, to do whatever he can

11   to support his family.  Everything has been turned

12   upside-down.

13           Every day he cannot believe that he made the

14   decisions that he made and how it affected not only him and

15   his mental state but his family, not only his three children

16   and his wife but greater family.

17           So in terms of deterring criminality and punishing

18   behavior, Mr. Comes will never be back in court again.

19   There is no doubt about that.

20           In terms of his otherwise good character and good

21   behavior, I think the Court, and we appreciate the Court

22   reading those letters that have been submitted, and I think

23   they speak volumes about him.  He is someone that,

24   regardless of any type of time, whether it's one day or one

25   hour, would not re-offend, Your Honor.

1            Now, we appreciate that the government has filed a

2      5K.  We appreciate the government's consideration of

3      Mr. Comes' cooperation.  Our position with respect to

4      sentencing, as the Court knows, is that we're requesting

5      that the Court impose no more than 16 months.  That would be

6      an appropriate amount of time not only for punishment but to

7      deter any type of criminal behavior.  We're requesting that

8      that time could be at Duluth.

9            And we are requesting, Your Honor, if the turn-in

10     date could be no sooner than June 19th.  The reason for that

11     is he would like to go to two things.  One is celebrate his

12     youngest child's 12th birthday which is on June 12th, and

13     he'd like to clear some things with his father when he meets

14     his father at a family wedding in South Dakota in a few

15     weeks for personal reasons.  So if at all possible, he would

16     request that, Your Honor.  That's all I have.  Thank you.

17            THE COURT:  All right.  Will you have his wife

18     come forward, Pamela.

19            MR. TAMBURINO:  Oh, sure.

20            THE COURT:  Good morning.

21            WOMAN:  Good morning.

22            THE COURT:  Would you state your name for the

23     record, please?

24            WOMAN:  Dr. Pamela Comes.

25            THE COURT:  And you're married to Marlyn?

1          WOMAN:  Yes.

2          THE COURT:  And why don't you tell me about your

3     relationship with him.

4          WOMAN:  We've been married for 22 years and we

5     haven't spent more than two days apart the whole time.  Oh,

6     my gosh.  He is the love of my life and he is a perfect

7     father.  He has taken care of us for years.  We both agreed

8     that I was going to stay home with the kids.  Even though we

9     graduated together, we have the same degree, I was able to

10    stay home with our kids for 14 years while he had his

11    practice.  I trust him 100 percent.  We have talked about

12    this kind of thing and truly never, ever thought that this

13    was a problem or that this was ever going to be a situation.

14    I know now that it was wrong.  I know now that, you know,

15    there was a lot involved there that I didn't know.  But it

16    was never about criminality.  He is a wonderful, wonderful

17    person, and our kids are going to be devastated if he's not

18    with us.  I wish there was anything that we could do to keep

19    him with our family and not in prison.

20          I know it's a financial crime, and I wish there

21    could be a financial solution.  If we could pay back, we've

22    already lost the majority of our savings, but we will both

23    work until the day that we die to stay together, and we will

24    stay together, and we will fight through.  But we have a

25    19-year-old that's waitressing this morning and she couldn't

1    look at him when she left because she was so scared.  And

2    then our 16-year-old and our 12-year-old, well, soon to be

3    12, don't know anything yet.  We're terrified of what the

4    next couple of weeks of trying to explain to them that dad

5    has to go to prison, that he loves you but he's not going to

6    be here every day.  So if you could take that into

7    consideration.

8              My family is here.  Marlyn's family has been

9    texting all morning.  They all would have been here but

10   Marlyn honestly didn't want to put any of us through any

11   more of this.  He has taken on this burden himself.  He gets

12   up every day, feeds the kids, puts them on the school bus

13   before he goes to his construction job that I know he hates.

14   He feels so let down.  He's been so embarrassed and so hurt

15   for these two and a half years.

16             The first couple of weeks after this happened it

17   was like a death, we were in shock.  He lost 30 pounds in

18   about a week.  We didn't eat.  We didn't sleep.  We sat but

19   all he wanted to do was be with us.  He didn't want to be in

20   the house alone.  He wanted to hold the kids.  The only

21   entertainment he wanted to do was to play cards or be with

22   my family that's sitting back there.  He is all about

23   family.  He is all about support.  He will never do anything

24   like this.  It was a huge, huge mistake that I wish that

25   there was something that we could do to just make it go

1    away.  It has been awful.  I have prayed every day to God

2    and, to a sense, you, saying please have mercy on us.

3            THE COURT:  Thank you.  Mr. Comes.

4            THE DEFENDANT:  Thank you, Your Honor, for

5    listening to me today, and thanks for reading the letters

6    from my friends and family.  I also wanted to thank Houa

7    Vang who is a very compassionate professional in helping my

8    wife and me through these horrible times.

9            Your Honor, I want you to know how truly sorry I

10   am for ever being involved in a situation like this and for

11   the pain that I've caused my family.  This has and will

12   forever be my biggest regret in life.  I know that you've

13   heard it a thousand times, but honestly, I had no idea it

14   would ever be considered insurance fraud and have severe

15   implications that it does.  My mistakes were because of

16   ignorance, not malice.  And I do take some peace knowing

17   that I always did what was best for the patient.  I treated

18   them well.  And I was a good doctor.  I have --

19           THE COURT:  Well, let's back up.  My understanding

20   is part of you keeping your license, you have to take ethics

21   courses.  Is that correct?

22           THE DEFENDANT:  Yes, I did.

23           THE COURT:  And during the ethics course, they

24   talked about the Minnesota statute dealing with runners.  Is

25   that right?

1           THE DEFENDANT:  Yes, it is.

2           THE COURT:  And they said that was illegal?

3           THE DEFENDANT:  Yes.

4           THE COURT:  Now, you're telling me that you didn't

5      know.  I don't understand how you can say that to me.

6           THE DEFENDANT:  No, runners are illegal.  I got by

7      it or I convinced myself by using interpreters because they

8      would help interpret and paperwork and things of that

9      nature, so I kept saying, telling myself that they were

10     interpreting, they were doing a service for me, but in

11     actuality, they were runners.  They were bringing patients

12     to me.  But like I said, they would do a service, I would

13     give them interpreting.  But yes, I did know runners were

14     illegal.  But on the grand scale, again, I had no idea it

15     was this magnitude and the severe consequences.  I didn't

16     think it was complete insurance fraud.

17          THE COURT:  What did you think it was?

18          THE DEFENDANT:  I thought it was a moral or an

19     ethical, more a chiropractic board problem.  Like I said, I

20     had --

21          THE COURT:  But knew it was fraud?

22          THE DEFENDANT:  I just didn't know who I was

23     defrauding, I guess, because every patient that came in my

24     door was a legitimate patient, they were in an accident,

25     they had injuries, I treated them 100 percent like I would

1    treat anybody else, they got the care that they deserved,

2    reasonable, necessary.  That's never been questioned.  I

3    never had one complaint about the care.  So, again, as long

4    as I thought they were legitimate patients and they were

5    getting the treatment that they needed and deserved, I

6    fooled myself into thinking it wasn't a problem how they

7    came into my door.  And these people, I didn't seek them

8    out.  They would show up at my door.  They'd have the proper

9    paperwork, police report, their accident reports, and things

10   like that.  I made sure everything was completely fine.  If

11   I didn't like it or something looked like a red flag, I

12   turned them away.  I didn't want to be a part of fraud or

13   anything of that nature or what I would think of fraud, or

14   jump-ins, staged accidents, something like that.  If I

15   thought it was that at all, I would turn them away because I

16   didn't want anything to do with that.  So it was clear that

17   it was a legitimate accident, that they were injured in the

18   accident, and I gave them reasonable and necessary care.

19          THE COURT:  Tell me more about your thinking.  In

20   talking to other chiropractors, was this a common course of

21   business or what?

22          THE DEFENDANT:  Yes.

23          THE COURT:  What helped convince you that you

24   were, even what you were doing by saying interpretive

25   services, made you get past the ethical and moral hurdle?

1          THE DEFENDANT:  Again, like when they would walk

2    in your door and they'd either say, you know, I'll be the

3    interpreter on this case or we're going somewhere else, it's

4    kind of hard to turn them away.  I'm, I mean, I tried to get

5    business through obviously all other kind of things, but

6    when they're walking in your door, here's a patient that's

7    injured, I just took it on.

8          And as far as the, you know, going on, it has been

9    going on for a long, long time in the chiropractor

10   profession.  I bought my practice over 20 years ago and at

11   that time the -- the doctor that bought it to me introduced

12   me to an interpreter that he used a long time ago.  So it

13   has been going on.  But, again, it has been a gray area, as

14   far as I know, an ethical, I thought my license would be in

15   jeopardy or more of a state issue.  I -- I never thought it

16   was an implication of this magnitude.  And if I did, I

17   guarantee you I would have stopped it completely.

18          THE COURT:  Well, help me out here.  You say that

19   -- let's forget that you're here before me.  You talked

20   about you thought it was a state issue and that it would be

21   a board issue.  Well, without your license, you couldn't

22   practice, so that's as harmful as what I can do here.

23          THE DEFENDANT:  Yes.  Losing my license was

24   devastating.  I had to change my whole career.  I have to

25   work construction or whatever.  But me being away from my

1    family is ten times worse in my mind.  Like my wife said,

2    I've never been away from her for more than two nights.  My

3    kids are wonderful kids.  I'm more devastated about that.

4    Losing my license is horrible, but I will find other work

5    and doing whatever I can to support my family, but being

6    away from my family is my biggest fear.

7              THE COURT:  Okay.  Go ahead.  Finish your

8    statement.

9              THE DEFENDANT:  I kind of went over that.  But I

10   know there needs to be punishment, but I assure you that me

11   and my family have been punished.  Like I said, I've lost my

12   license and probably will never practice again.  I lost my

13   business that I worked 20 years to build.  We've been

14   destroyed financially.  We lost all our savings that we had

15   in place for us and our kids' future.  The pain and

16   suffering, the anxiety and fear and suffering that we've

17   gone through these past two and a half years is immeasurable

18   that I've put my family through.

19             And, Your Honor, I'm just begging you, please be

20   compassionate and lenient in your sentencing.  I will

21   continue to show my remorse and pay for any of the mistakes

22   that I have because I am so sorry for what I have done.  And

23   if it was just me being punished, I wouldn't say a thing,

24   but I have to be honest, and I am terrified of what it will

25   do to my family if I'm not there, loving and supporting them

1    every day.

2         Like I said, my wife and I haven't spent over two

3    nights apart.  My kids are awesome, smart, and hardworking.

4    I'm afraid it's going to affect them in the future.  And the

5    last thing I want to do is cause any more pain and

6    embarrassment than I already have.  I have prayed for so

7    long for this to be over and the opportunity to continue to

8    work with my family and rebuild our lives.  And, again, I'm

9    sorry for what I did, and I will never do anything to lead

10   me back here again.  Thank you.

11        THE COURT:  Thank you.  For the government.

12        MR. KOKKINEN:  Your Honor, I guess I'll start with

13   a little bit of the bad and then I'll end on some of the

14   good which I think you heard about.  But, I mean, Dr. Comes

15   has accepted responsibility.  He did cooperate, and that's

16   an important thing.  I think there still is a bit of --

17   well, let me start maybe by saying, from my observations

18   there seems to have been a culture of acceptance within

19   certain segments of the chiropractic community of this kind

20   of behavior, and I think that, and I think you heard about

21   it a bit this morning, allowed people to justify their

22   behavior.  But make no mistake about it, every single one of

23   the chiropractors knew what they were doing was wrong, that

24   it was illegal, that it violated the rules from the Board of

25   Chiropractic, and that it was something that, most of all,

1     the insurance companies could not find out about.

2          And, you know, I guess it's possible to

3     compartmentalize in your mind and I'm just hiding

4     information from the insurance companies but I'm not

5     defrauding them.  Well, that's the definition of fraud is

6     when you're hiding important information from an insurance

7     company to get that money.  And Dr. Comes, like a lot of the

8     other chiropractors, was the same.  He instructed runners to

9     tell the patients you can't let anybody know about these

10    payments, you can't let the insurance companies find out

11    about them, disguising them as translation fees and

12    undercover interactions with Dr. Comes.  He told the

13    undercover that paying for patient referrals was illegal so

14    that the way they'd get around that was by categorizing them

15    as translation fees.  So there is a bit of I guess kind of a

16    turning of a blind eye, you heard a moment ago, to just how

17    wrong this was.  It's not a question of whether it was wrong

18    but just how significant the consequences would be.

19          Sticking along that theme of turning a blind eye,

20    you also heard from Dr. Comes today that he thought that all

21    his treatment was medically necessary and reasonable.  And,

22    to be fair, you know, we haven't done a workup on him the

23    way we did on some of the other chiropractors that Your

24    Honor has presided over those cases, but it's a little bit

25    of a turning of a blind eye, again, to not understand that

1    when you start making these payments, there's necessarily

2    going to be a lack of medical necessity and reasonableness

3    going on.  It calls into the question the motives of the

4    patient, why are they actually coming to treat, are they

5    coming because they need it or because they heard from a

6    friend that you can get paid $1,200 if you go to Dr. Comes'

7    clinic.  It calls into questions the motives of the runners,

8    Are they bringing someone who is really hurt or someone who

9    has been in a fake accident?

10            And I know that Dr. Comes says he never knew about

11   that and that's a credible report but -- and it also calls

12   into the question, there's deluding of the self if you don't

13   acknowledge when you start paying and setting a threshold of

14   six visits or 12 visits to earn that payment, you're

15   necessarily building in, in your own mind, subconsciously,

16   that you're going to treat everyone at least a certain

17   amount of time so that you can make back that money that

18   you've paid out as well as turn a profit.

19            The one other bad part before I end on I guess the

20   good is talking about Sahal Warsame, Dr. Comes' primary

21   runner.  You know, Your Honor will have to decide I guess

22   ultimately who was taken advantage of between Dr. Comes and

23   Sahal Warsame.  You know, the story we heard today was that

24   to a certain extent the runners took advantage of the

25   chiropractors, that they came with this commodity, a

1    patient, that would enable the chiropractor to be able to

2    bill the insurance companies and took advantage of the

3    chiropractor, forced them to make those payments in order to

4    keep the patient, and there's probably some truth to that.

5    There's also probably truth to the point that the

6    professionals, the ones who know about the licensing

7    requirements, who know about the specifics of the law took

8    advantage of the runners too, Sahal Warsame, for example,

9    and I know Your Honor is well aware of the drastic

10   consequences that Sahal Warsame's involvement is having on

11   his life and his immigration status and looking at prison

12   time himself and tax consequences and things of that nature.

13          So it's not as if this is a victimless crime.  And

14   some of the people who were victimized by it were some of

15   the people who were participants in it, and that's certainly

16   true.  And, you know, the -- our heart goes out to Dr. Comes

17   and his family for the hardship that they're going to have

18   to endure, that they've endured and will continue to have to

19   endure with all of this, but, you know, those thoughts

20   should have been in their mind and Dr. Comes' mind when he

21   was making the deliberate choice to engage in this conduct.

22          So on to the good, I can't stress enough how

23   cooperative Dr. Comes has been in this investigation.  As

24   Mr. Tamburino pointed out, he was the very first individual

25   to come in, indicate an interest in pleading guilty and

1  cooperating.  He provided very useful information that

2  helped the government, the investigators, understand exactly

3  the mechanism that the scheme worked.  We certainly knew a

4  lot from our undercover operations, but getting an insider

5  like Dr. Comes provided valuable information that we were

6  able to apply in all the other chiropractor cases to help in

7  build our cases in those.  He's been truthful.  He's been,

8  as I mentioned, he's been candid, although, at some times,

9  and this is understandable, wanting to justify his behavior

10  and try to minimize just how bad it was, and that's

11  understandable, but I can say that he's been truthful and

12  credible in all our interactions and has been willing to

13  provide whatever assistance we've asked of him.

14       The government's recommendation in our 5K motion

15  was a significant departure, approximately 30 percent, and

16  that would put Dr. Comes in a guideline range of about

17  21 months which is not too far off of what Mr. Tamburino has

18  suggested.

19       The government submits that for all of the reasons

20  we have outlined in our sentencing position and in our 5K

21  letter that a sentence within the range of about

22  approximately 21 months would be reasonable, but not greater

23  than necessary, to serve all the federal sentencing rules.

24  Thank you.

25       THE COURT:  Okay.  Do your agents, Ms. Khan and

1    Ms. Kelly, have anything to add?

2              MR. KOKKINEN:  Let me check with them, Your Honor.

3              No, Your Honor.  I would add for the record that

4    there is a representative of State Farm sitting in the

5    courtroom today.  And so just as a bit more flavor, as Your

6    Honor knows that this was a big issue for the insurance

7    companies, they didn't just start investigating for no

8    reason.  They obviously noticed that there was an increase

9    in billing and evidence of fraudulent activity, and so State

10   Farm I know submitted a very lengthy victim impact statement

11   that probably does a better job of crystallizing the

12   problems associated with this conduct, and just wanted to

13   point out for the record that they're here today.

14             THE COURT:  All right.  Please step forward.

15             On February 21st, 2017, the defendant pled guilty

16   to conspiracy to commit healthcare fraud in violation of

17   Title 18, United States Code, Section 1347, and Title 18,

18   United States Code, Section 1349.  It is considered and

19   adjudged that the defendant is guilty of that offense.  The

20   Court has received from the government a motion for a 5K1.1

21   downward departure because of substantial assistance to the

22   government.  The Court has reviewed that document and

23   has -- and will grant that motion.

24             The Court has also reviewed the presentence

25   investigation report.  The Court has reviewed all the

1    submissions of counsel, both the advocacy letters and then

2    the letters of support for the defendant.  The Court has

3    read the government's support memorandum.  And the Court has

4    reviewed all the United States Supreme Court and Eighth

5    Circuit Court of Appeals decisions that would pertain to

6    this sentence, and will apply the factors under Title 18,

7    3553a in sentencing the defendant here today.

8              My sentence is, so everyone, not only for this

9    defendant but for all the other chiropractor defendants

10   coming before me, Mr. Comes, you are going to get a sentence

11   that is going to be a little different than possibly the

12   other defendants.  I don't know yet.  I haven't gotten their

13   presentence investigation report.  But you are the first

14   person, first chiropractor to come before me with a plea of

15   guilty, the first one that really cooperated with the

16   government, even before you were indicted, helped them have

17   a roadmap in their investigation of this matter.  That

18   becomes very important to me because it is -- that is

19   substantial assistance, even though you -- it wasn't

20   necessary for you to get on the witness stand and be under

21   oath and be cross-examined dealing with Mr. Warsame, but the

22   initial investigative information that you were able to give

23   the government is a plus-plus to me.  Because it's dealing

24   with financial crimes is very difficult for those of

25   investigations unless there is somebody that will help give

1    the roadmap to the government so those can be flushed out

2    and the criminality be assessed to those individuals that

3    are involved in that.  And so I do give you a plus-plus, in

4    my mind, for being the first and being open, and there's

5    nothing that I've seen today or when I took the plea and the

6    time that I've spent with my probation officer that would

7    give me any indication that you are one that's trying to

8    deceive me in just to get a lesser sentence.  And so that's

9    very important, I want you to know that.

10          The sentence is as follows.  The defendant is

11   hereby committed to the care and custody of the Bureau of

12   Prisons for a period of one year and one day.  There is no

13   fine.  The defendant is sentenced to a term of two years

14   supervised release.  Mandatory restitution is applicable in

15   this case of $633,420.  And that is to be split, the amount

16   is to be split between two insurance agencies, Travelers and

17   State Farm.  State Farm has filed papers for the amount of

18   $310,722.24.

19          Over the period of time that you are incarcerated,

20   you shall make payments of either quarterly installments of

21   a minimum of $25 if working non-UNICOR or a minimum of

22   50 percent of monthly earnings if working UNICOR.  It is

23   recommended that you participate in the Inmate Financial

24   Responsibility Program while you are incarcerated.  Payments

25   of not less than $200 per month are to be made over a period

1     of two years, commencing 30 days after release from

2     confinement.  Payments are to be made payable to the Clerk,

3     United States District Court, for disbursement to the

4     victims.  Waiver of interest is granted.  If the defendant

5     has not satisfied the full restitution obligation prior to

6     the termination from probation, the defendant must pay the

7     full remaining restitution.  The obligation to pay

8     restitution, fines, or other penalties shall terminate the

9     latter of 20 years from the entry of judgment, 20 years

10    after the defendant's release from imprisonment, or upon the

11    defendant's death.  See Title 18, United States Code,

12    Section 3616.

13              The following mandatory conditions are applicable:

14              The defendant shall not commit any crimes,

15    federal, state, or local.

16              The defendant shall not unlawfully possess a

17    controlled substance.  The defendant shall refrain from any

18    unlawful use of a controlled substance.  The defendant shall

19    submit to one drug test within 15 days of release from

20    imprisonment and at least two periodic drug tests thereafter

21    as determined by the Court.  Mandatory drug testing is

22    suspended based on the Court's determination that the

23    defendant poses a low risk of future substance abuse.

24              Next, the defendant shall cooperate in the

25    collection of DNA as directed by the probation officer.

1          Since this judgment imposes a -- imposes

2     restitution, the defendant must pay in accordance with the

3     schedule of payments sheets of this judgment.

4          The defendant shall notify the Court of any

5     material change in the defendant's economic circumstances

6     that might affect the defendant's ability to pay

7     restitution, fines, or special assessments.

8          Next, the defendant shall abide by the standard

9     conditions of supervised release that have been adopted by

10    this Court, including that the defendant must report to the

11    probation office in the federal judicial district where the

12    defendant is authorized to reside within 72 hours of the

13    defendant's release from imprisonment, unless the probation

14    officer instructs the defendant to report to a different

15    probation office or within a different timeframe.

16         And defendant shall not own, possess, or have

17    access to a firearm, ammunition, destructive device, or any

18    other dangerous weapon.

19         Next, the defendant shall comply with the

20    following special conditions:

21         If not employed at a regular, lawful occupation as

22    deemed appropriate by the probation officer, the defendant

23    may be required to perform up to 20 hours of community

24    service per week until employed.  The defendant may also

25    participate in training, counseling, daily job search, or

1    other employment-related activities as directed by the

2    probation officer.

3         Next, the defendant shall provide the probation

4    officer access to any requested financial information,

5    including credit reports, credit card bills, bank

6    statements, and telephone bills.

7         Next, the defendant shall be prohibited from

8    incurring new credit charges or opening additional lines of

9    credit without approval of the probation officer.

10        And finally, there's a $100 special assessment

11   payable to the crime victims fund which is required by

12   statute to be paid immediately.

13        Sir, if you have not -- sir, if you feel that the

14   Court has not followed the law or the Constitution in

15   sentencing you here today, you have a right to appeal my

16   sentence to the Eighth Circuit Court of Appeals which is the

17   higher court that reviews all of my sentences.  You have

18   14 days from today's date to file your notice of appeal

19   telling that court that you are going to appeal my sentence.

20        However, there is a plea agreement that you've

21   entered into with the government, and I can't remember if

22   there is a provision within that agreement that limits or

23   waives your right of appeal.  Mr. Kokkinen.

24        MR. KOKKINEN:  There is, Your Honor.  Mr. Comes

25   waived his right to appeal any sentence unless the sentence

1    was greater than 37 months.  So with Your Honor's sentence,

2    that appellate waiver would kick in.

3              THE COURT:  All right.

4              MR. TAMBURINO:  That's correct.

5              THE COURT:  All right.  However, it's my position

6    that if there is a constitutional issue that arising out of

7    my sentence or out of the nature of these charges, you will

8    always have that right to appeal, and so within 14 days of

9    today, if there's something that comes down from the Eighth

10   Circuit or some other circuit or the Supreme Court that

11   would affect my sentence or your attorney thinks would

12   affect my sentence within that 14-day period, you would

13   have -- you should file their notice of appeal, because any

14   constitutional issue, I've never allowed a waiver of that by

15   a defendant because that's very important that I follow the

16   Constitution and the law.  Do you have any questions?

17             Oh, the request for -- the Court will recommend to

18   the Bureau of Prisons that he be housed in a facility in

19   Minnesota.  And the Court will -- what's the first day after

20   Labor Day?

21             THE COURTROOM DEPUTY:  I'm sorry?

22             THE COURT:  The first day after Labor Day.

23             THE COURTROOM DEPUTY:  September 4th.

24             THE COURT:  All right.  Now, Mr. Comes, I can't

25   call you doctor, it's Mr. Comes.  Now, one of the things, if

1   your wife would come up here.  Mr. Comes, come to the

2   microphone, you're the one being sentenced.  You're going to

3   have to tell your family and friends what's happened here,

4   and I don't need ifs and buts about it.  Mr. Kokkinen hit it

5   right on the button.  This was a crime.  You knew it was a

6   crime.  It's best to say that and look your children in the

7   eye and say that you made a mistake, not if, but, when, or

8   gray area in trying to minimize what you've done.  If you do

9   it, then everyone can do it and that's what you're -- you

10  don't want your kids to grow up doing.  Temptation, the

11  work, the business that you were in, the business you

12  bought, that was part of it, it just, it became natural.

13  And as you've told me and as I've seen over 35 years of

14  being a judge, 11 years of being a criminal defense lawyer,

15  a public defender, the people will justify anything and can

16  justify practically anything.

17          And the sentence I gave you is extraordinarily

18  low.  And so with that I want you to be honest with

19  yourself, both of you.  You've talked about it at home, and

20  it's easy to justify.  But let's not justify behavior that

21  is morally wrong, ethically wrong, and criminally wrong.

22  And you were the leader on that.  I find you to be a

23  stand-up person, and I expect you to do that, not only to

24  your children but to the people you lead, because there's

25  always small business people that don't like the government,

1    don't want to pay taxes, don't want to do this.  It's so

2    easy to try to get around it and justify it because someone

3    else is doing it.

4         It has got to stop somewhere.  When we see the

5    large corporations do it, we all bang the table and say oh,

6    those crooks got away with it and no one is going to jail

7    for it, but here we've got a industry that I don't have the

8    slightest idea of the magnitude of what's happening in your

9    profession, but what I've seen, I've got 27 cases, that's a

10   lot, and so I can extrapolate that it's a large portion of

11   the chiropractic care because this is not only in Minnesota,

12   it's in other jurisdictions too, there's insurance fraud.

13        So it's important that today you take ownership

14   for what you did.  And I'm not shouting, I'm not pounding on

15   the table, I'm talking to you just person to person.  Take

16   responsibility, and it will help the system, it will help

17   your family and friends understand when they say, oh, there

18   was other people doing it.  Yes, there were other people

19   doing it, but you were doing it and you knew it was wrong.

20   And look them in the eye so they understand.  Can you do

21   that?

22             THE DEFENDANT:  Yes, I can, sir.

23             THE COURT:  All right.  Anything further for the

24   sentencing?

25             MR. KOKKINEN:  Your Honor, I would just ask that

1    the restitution order be ordered joint and several with

2    Sahal Warsame.

3              THE COURT:  So ordered.  And he is to turn himself

4    in on September 4th, 2018, at 12 noon at the designated

5    place of confinement for your sentence.  If the Bureau of

6    Prisons has not designated a place of confinement by that

7    time, you are to turn yourself in to the United States

8    Marshal's Office here in Minneapolis which is in this

9    building on September 4th, 2018, at 12 noon.

10             Now, you're on release, and you're not to violate

11   any of the conditions of those -- that I have for your

12   release.  If you do, you understand that I could have a

13   hearing and see whether or not I'll take you into custody

14   and you would start your sentence at that point.  I'm giving

15   you time with your children this summer, so make the most of

16   it.  And yes, I don't expect to see you ever again in these

17   circumstances standing before me on a criminal matter, so I

18   don't have any problems with the sentence I have given you.

19   That, what, how many more have I got to go?

20             MR. KOKKINEN:  19, Your Honor.

21             THE COURT:  19 more to sentence, and each one will

22   be individual sentences.  And so good luck.

23             MR. TAMBURINO:  Thank you, Your Honor.

24             THE DEFENDANT:  Thank you.

25             WOMAN:  Thank you very much, Your Honor.

1          (Proceedings concluded at 11:31 a.m.)

2                              *      *      *

3

4

5          I, Staci A. Heichert, certify that the foregoing is

6    a correct transcript from the record of proceedings in the

7    above-entitled matter.

8

9                    Certified by:   *s/ Staci A. Heichert*

10                                   Staci A. Heichert,
                                     RDR, CRR, CRC
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25